UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| GEOSHACK CANADA COMPANY, et al., | : : | Case No. 3:19-cv-00158 |
| Plaintiffs/Counter Defendants, | : : : | District Judge Thomas M. Rose<br>Magistrate Judge Sharon L. Ovington |
| vs. | : : | |
| DANIEL W. HENDRIKS, | : : | |
| Defendant/Counter Claimant. | : | |

**DECISION AND ENTRY**

**I.      Introduction**

Plaintiffs Geoshack Canada Company and GNA Canadian Holding Company (collectively, Geoshack) entered an Employment Agreement with Defendant Daniel W. Hendriks in 2004.  For many years the parties to this Agreement enjoyed its benefits.  But difficulties eventually arose.  They now accuse each other of breaching the Agreement, and their efforts to sort this out by way of litigation has run into a snag in the form of the present discovery dispute embodied in Hendriks' pending Motion to Compel (Doc. #16), Geoshack's Memorandum in Opposition (Doc. #17), and Hendriks' Reply (Doc. #19).

Hendriks seeks discovery related to the value of certain shares of stock issued to him at the start of his employment under the terms of the Employment Agreement.  The value of the shares is set by their "net book value."  Section 6.4(G) of this Agreement explains that if Hendricks' resigns or if Geoshack terminates his employment without

cause, he would receive 150% of the *net book value* of the shares; if Geoshack terminates him with cause, he would receive 100% of the *net book value* of the shares.[1] (Doc. #1, *PageID* #s 14-16) (italics added).

The problem is that Section 6.4(G) neglects to identify the date upon which the net book value of the shares would be determined. *See* Doc. #1, *PageID* #18, ¶6.4(G). Hence the parties' present discovery dispute.

## II.  Background

### A.  The Parties' Agreements

Geoshack explains that the parties executed a number of interrelated documents at the start of Defendant Hendrik's employment. These include, in part, his Employment Agreement plus an Agreement to Exchange Shares, and a Stock Purchase Agreement. GeoShack also created a new class of shares, B shares, in connection with the transaction. Hendriks received seventy-six B shares at that time.

The Agreement to Exchange Shares gave Hendriks (1) an option to exchange his Class B shares for Geoshack North America, Inc. (GNA) common stock; (2) immediate GNA shareholder voting rights; and (3) GNA's guarantees of certain of GeoShack Canada's obligations. And Hendriks signed a GNA Close Corporation Agreement simultaneously with the exchange of his Class B series shares. *See* Doc. #17, *PageID* #s 176-77.

---

[1] Much appears at issue: Hendriks asserts that the 100% net book value of his shares is 3.3 million dollars and 150% net book value is 4.95 million dollars. (Doc. #10, *PageID* #54). Geoshack denies these assertions.

Geoshack notes that on February 27, 2016, Hendriks exchanged eleven of his Class B series shares for eleven common shares of GNA. He signed the GNA Close Corporation Agreement at that time and GNA redeemed his shares. After this exchange, Hendriks retained sixty-five Class B series shares. *See id.* at 177.

**B.     Hendriks' Termination**

Before delving into the events leading to the end of Hendriks' employment with Geoshack, it is worth pausing to note that the Employment Agreement provided, "This Agreement will … continue until employment is terminated by the Employee or the Employer." (Doc. #1, *PageID* #12, §2.2). Two questions follow from this provision: Who terminated Hendriks' employment and when?

Geoshack alleges that Hendriks' job performance declined during the last three years of his employment. A letter dated November 1, 2018, written by P. Scott Beathard President of Ultara Holdings, Inc. (formerly known as Geoshack North America, Inc.) wrote, "This letter provides you with formal notice that you are in material breach of your Employment Agreement with Geoshack Canada Company." (Doc. #1, *PageID* #27). The material breach, according to Beathard, was Hendriks' lack of job performance. *Id.* The letter informed Hendriks that he was placed on administrative leave for the next 30 days and asked him to propose "a plan to cure your past performance failures to determine whether your employment will continue after this thirty (30) day period or be terminated for Cause at that time." *Id.*

Hendriks responded on November 21, 2018: "It is my view that the substance of your letter of November 1, 2018 … and the actions you have taken on behalf of the

3

corporation constitute constructive dismissal of my employment." (Doc. #17, *PageID* #242). He opined, "A constructive dismissal is, in law, a termination 'not for cause.'" *Id*. Given this, he asserted that the Employment Agreement provided him with a "150% repurchase option of the convertible shares I own." *Id*. And he wrote, "I am hereby exercising the option to require Geoshack to purchase my shares." *Id*. He asked for a response in writing no later than November 28, 2018. *Id*. at 242-43.

Beathard emailed Hendriks on November 28, 2018, asking, in part, "Still need you to clarify your intentions, we have you on paid leave, but are you resigning before Nov. 30?" (Doc. #16, *PageID* #168). Hendriks replied on November 29: "I am surprised by your email. I would have thought that my emails on November 21st have made it clear that my employment has been brought to an end as of that date." *Id*. at 170.

On December 2, 2018, Beathard emailed Hendriks:

> Since we finally received your … clarification that you do not intend to work through these issues and have not proposed a corrective plan, we consider you to be terminated for cause effective Nov. 30, 2018—the end of your paid administrative leave period. We are hereby calling your stock at book value per the contracts ….

(Doc. #17, *PageID* #245).

About two weeks later—in letter dated December 18, 2018—Geoshack's counsel reiterated this position. He asserted that Geoshack had given Hendriks notice on November 1, 2018 of his material breach and that he had 30 "days to propose a plan to cure the performance deficiencies constituting the material breach." *Id*. at 172. Geoshack's counsel then explained:

> Once it became clear based on his [Hendriks'] email of November 29, 2018

4

>that he did not intend to cure his deficiencies within the 30-day period, and that he, in fact, had no intention of returning to work, the Company exercised its rights under the Employment Agreement to terminate his employment effective November 30, 2018, for cause.

*Id*. at 172-73.

### III. Discussion

>Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). "[T]he court must limit the frequency or extent of discovery … if it determines that … the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii).

Hendriks seeks an Order compelling Geoshack to produce "[a]ll communications and documents regarding or reflecting the net book value of [his] shares at any time between and concluding November 1, [2018] and December 18, [2018]."[2] (Doc. #16, *PageID* #108-09) (quoting Request for Production No. 6, *PageID* #141).

Geoshack objects on the ground that Hendriks "seeks documents not reasonably calculated to lead to the discovery of relevant evidence because the valuation date for calculating the net book value of Mr. Hendriks' shares is October 31, 2018." *Id*. at 141. Geoshack contends, "post-termination financial data is irrelevant and would have to be

---

[2] The original discovery request sought information from 2019. Hendriks intended to seek discovery during this time period in 2018. To their credit, the parties do not quibble over this.

5

created before it could be produced." (Doc. #17, *PageID* #181).

Hendriks argues that Geoshack has unilaterally and improperly selected October 31, 2018 as the date to determine the net book value of the shares. He finds a number of possible dates for determining net book value, "including: (i) the date the employee's relationship with the company ends; (ii) the date the company or employee provides notice of an intent to redeem the shares, or (iii) 30 or 60 days after such notice." (Doc. #16, *PageID* #111 (citation omitted)). He argues, "'Net book value' information for any of these dates would be relevant for determining how much [he] is owed for his shares." *Id*.

Geoshack's response brings up multiple points about Ohio contract law and ultimately argues that the GNA Close Corporation Agreement contains the following applicable language to determine the valuation date of net book value: "'The net book value of the Executive Shares shall be shown as [sic] in Geoshack's financial statements as of the month end preceding the effective date of the termination of employment.'" (Doc. #17, *PageID* #184) (quoting *PageID* #226). Yet this language appears in a Section of the Close Corporation Agreement that deals with a terminated employee who—unlike Hendriks—"does not have an employment agreement … which provides for a put/option with respect to such employee's shares." *Id*. at 225. Perhaps Geoshack reasonably or fairly relies on this provision by treating Hendriks and non-contract employees the same. Perhaps not because Hendriks' Employment Agreement may impose duties upon him that a non-contract employee does not have and may, in turn, reward Hendriks with more favorable rights than a non-contract employee would have.

6

Regardless, Geoshack's point is that it is end of the month preceding Hendriks' termination that matters—October 31, 2018.  The rub, however, is that the parties disagree over the effective date of Hendriks' termination and hence the date on which the net book value of his shares must be based.  Geoshack may be correct in arguing that Hendriks' employment was terminated on November 30, 2018 because of Beathard's letter on November 1 telling Hendriks he was in material breach and needed to "propose a plan to cure your past performance failures to determine whether your employment will continue after this thirty (30) day period or be terminated for Cause at that time."  (Doc. #1, *PageID* #28).  But the parties disagree about how to count this 30-day period.  Geoshack's counsel counts it as ending on November 30.  To do this he must count November 1 as day one; only then does he reach a count of 30 days on November 30.  But Beathard said in his November 1 letter that Hendriks was "placed on administrative leave for the next thirty (30) days…," suggesting that the 30-day period began the next day, on November 2.  If this is correct, the 30-day period would not have expired until December 1, 2018, making Hendriks' termination effective on December 1.  This, in turn, would mean that the end of the month preceding his termination—November 30, 2018— would be the correct date on which to base the net book Hendriks' shares.

Further issues arise for two reasons.  First, Hendriks' emails on November 21 and 29 muddled things further.  Remember, Hendriks wrote on November 29, "I would have thought that my emails on November 21st have made it clear that my employment has been brought to an end as of that date."  Did he think his employment ended on November 21 or did "as of that date" refer to Beathard's letter on November 1?  The

7

latter is possible because Hendriks wrote to Beathard (on November 21), "It is my view that the substance of your letter of November 1, 2018 …., and the actions you have taken … constitute constructive dismissal of my employment…." (Doc. #16, *PageID* #165). Yet, in this same letter Hendriks characterized his 30-day administrative leave as "an unwarranted administrative suspension…," *id*., not a termination. He argued, moreover, that his constructive dismissal constituted a termination "not for cause," *id*., in an attempt to exercise the 150% repurchase option provided in the Employment agreement. Whatever impact, if any, these parts of Hendriks' communications have on determining his termination date, the issue remains presently unresolved.

      Second, Hendriks argues that Geoshack did not provide him with the notice of termination required by the Employment Agreement until Geoshack's counsel's letter on December 18, 2018. As a result, his termination did not become effective until 30 days later. If this argument succeeds, Hendriks' effective termination date would be in January 2019. The end of the month preceding Hendriks' termination, December 31, 2018, would become the correct valuation date for determining the net book value of his shares.

      With this much in doubt, it is reasonable to theorize—at the present discovery phase of the case—that the correct date to use when determining the net book value of Hendriks' stock shares could be October 31, 2018, November 30, 2018, or December 31, 2018. Hendriks' Request for Production No. 6 thus seeks relevant information, or is reasonably calculated to lead to the discovery of relevant information, by asking for "[a]ll communications and documents regarding or reflecting the net book value of [his] shares

8

at any time between and concluding November 1, [2018] and December 18, [2018]."
(Doc. #16, *PageID* #141).

Geoshack next argues, "The Agreement to Exchange Shares also allows GNA to make 'final and binding' equitable adjustments to 'the number and kind of shares **or other consideration** as to which the series B Shares shall be convertible.'" (Doc. #17, *PageID* #184 (quoting, in part, Agreement to Exchange Shares, §2 Adjustments, *PageID* #210). Yet other language in Section 2 of the Agreement to Exchange Shares does not mention termination of employment as an event that allows GNA to equitably adjust the value of series B Shares. And the triggering events listed—"*merger, consolidation, recapitalization, reclassification, stock split-up, stock dividend combination of shares, or otherwise…*," *id*. at 210—do not specifically include a termination of employment and are not of the same character or class of triggering event as these broader company-wide triggering events. At the very least, a reasonable debate remains at this stage of the litigation over whether §2 applies to the termination of Hendriks' employment.

Geoshack further contends that it set October 31, 2018 as the valuation date by "following a company practice that it believed to be an industry-standard." *Id*. at 185. All this argument achieves for the moment is to raise factual questions about the existence and substance of an industry standard for determining net book value of shares upon termination of employment. Geoshack probes further along this line by relying on Beathard's explanation that:

> 18.  Ultara customarily determines the net book value for the company and its related entities in connection with closing an accounting period, i.e., the end of a calendar year.

9

> 19. Calculating net book value requires a host of other calculations and projections including projected taxes, accruals, year-end adjustments, write-offs, fixed asset value, inventory, and others in accordance with relevant accounting standards.
>
> 20. Mr. Hendriks request for "all communications and documents regarding or reflecting net book value of Mr. Hendriks' shares at any time between and [sic] November 1, 2019 and December 18, 2019" reveals a lack of knowledge and understanding of the fact that such documents are not created in the ordinary course of business and do not exist.

*Id*. at 191-92.

Hendriks argues that his discovery request is not burdensome because Geoshack "did this when they calculated Mr. Hendriks share value as of October 31, 2018." (Doc. #19, *PageID* #264). If Geoshack has calculated Hendriks' share value using October 31, 2018 as the net-book-value date, communications and documents regarding or reflecting the net book value of his shares on the date are relevant and discoverable under Rule 26(b)(2), and must be produced. If Geoshack has not calculated Hendriks' share value using October 31, 2018 as the net-book-value date, its counsel should verify this through reasonable inquiry followed by supplementation of Geoshack's response to Hendriks' Request for Production No. 6.

Hendriks further asserts that Geoshack "is contractually obligated to calculate the net book value of [his] shares. Thus, if the Court (or a jury) were to find that the correct valuation date for Mr. Hendriks['] shares was one of the alternative dates [he] suggests, Plaintiffs must calculate [his] share value…. Also, Mr. Hendriks is not required to simply accept Plaintiffs['] calculations, Mr. Hendriks is entitled to review, examine, inspect and then perform his own calculation of net book value now that the parties are in

10

litigation with all the same and necessary financial and business information that Plaintiffs use….." *Id*. at 264-65.

Because the correct valuation date and the effective date of Hendriks' termination remain at issue, his request for production of "communications and documents regarding or reflecting the net book value of [his] shares at any time between and concluding November 1, [2018] and December 18, [2018]" seek relevant information or are reasonably calculated to discover relevant information concerning the value of his shares. Geoshack's objection to this discovery request is therefore overruled.

Geoshack, however, is not required to create documents that do not presently exist. What must Geoshack produce? The answer is in the language of Hendriks' Request for Production No. 6 and the Employment Agreement, which describes the "Calculation of Net Book Value":

> [T]he net book value of the Employee's Shares shall be based on the financial statements of GeoShack NA and shall be determined as if the Employee's Shares have been converted into common shares of GeoShack NA. Net book value per share of the Employee's Shares shall be determined by dividing the net book value of GeoShack NA as a whole, by the number of outstanding shares of GeoShack NA, plus the number of any outstanding shares held by any person or entity that are convertible into shares of GeoShack NA, plus the number of outstanding options held by any person or entity to purchase shares of GeoShack NA.

(Doc. #1, *PageID* #18, §6.4(G)). Geoshack must produce communications and documents containing this information from November 1, 2018 to December 18, 2018.

Accordingly, Hendriks' Motion to Compel is well taken.

**IT IS THEREFORE ORDERED THAT**:

1. Hendriks' Motion to Compel (Doc. #16) is GRANTED; and

11

2.     Plaintiffs shall produce discovery in response to Hendriks' Request for Production No. 6 as set forth herein.

June 18, 2020                                               *s/Sharon L. Ovington*
                                                                          Sharon L. Ovington
                                                                          United States Magistrate Judge