## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**GeoShack Canada Company, et al.,**

*Plaintiffs/Counter-Defendants,*

**v.**                                                          **Case No. 3: 19-cv-158**

                                                          **Judge Thomas M. Rose**

**Daniel Hendriks,**

*Defendant/Counter-Plaintiff.*

---

**ENTRY AND ORDER DENYING MOTION TO EXCLUDE BY DANIEL W. HENDRIKS, DOC. 70; DENYING MOTION TO STAY OR DEFER RULING RE: 69 MOTION FOR SUMMARY JUDGMENT BY DANIEL W. HENDRIKS, DOC 77; GRANTING IN PART MOTION FOR SUMMARY JUDGMENT AGAINST GEOSHACK CANADA COMPANY BY DANIEL W. HENDRIKS, DOC. 58, AWARDING DANIEL W. HENDRIKS $52,855.00 PER SHARE OF STOCK AND 7.25% INTEREST FROM MAY 30, 2019; DENYING DANIEL W. HENDRIKS'S MOTION FOR SUMMARY JUDGMENT ON CLAIM THAT HENDRIKS WAS TERMINATED "FOR CAUSE," DOC. 59; GRANTING MOTION FOR SUMMARY JUDGMENT BY GNA CANADIAN HOLDING COMPANY, GEOSHACK CANADA COMPANY, GNA CANADIAN HOLDING COMPANY, AND GEOSHACK CANADA COMPANY, DOC 69; AND TERMINATING CASE.**

---

Pending before the Court are five motions the parties have entitled: Motion for Summary Judgment against Plaintiffs by Defendant Daniel W. Hendriks, Doc. 58; Defendant's Motion for Summary Judgment on Plaintiffs' Claim that Hendriks was Terminated "For Cause," Doc. 59; Motion for Summary Judgment by Counter-Defendants GNA Canadian Holding Company,

GeoShack Canada Company, Plaintiffs GNA Canadian Holding Company, GeoShack Canada Company, Doc 69; Motion to Exclude by Defendant Daniel W. Hendriks, Doc. 70; and Motion to Stay or Defer Ruling re 69 Motion for Summary Judgment by Defendant Daniel W. Hendriks. Doc 77. The Court will begin by considering Motion to Exclude by Defendant Daniel W. Hendriks. Doc. 70.

## I.     Motion to Exclude

Defendant Daniel W. Hendriks seeks to exclude the testimony of Thomas L. Hawthorne Jr., Chief Operating Officer for Defendant GeoShack North America. Hendriks would have Hawthorne's testimony excluded because GeoShack did not name Hawthorne as a witness in response to discovery.

In response to interrogatories that asked GeoShack to list the individuals who it believed had relevant information and for the individuals that it planned to call at trial, GeoShack listed only Scott Beathard and Dan Hendriks. (Doc. 74-3, PageID 1400-01). GeoShack later amended this response on December 20, 2020, to include Dan O'Reilly, but not Hawthorne. (Doc. 70-12, PageID 1226). Plaintiff's witness list concluded:

> Plaintiff reserves the right to (a) designate additional witnesses, if needed; (b) elicit opinion testimony from its witnesses; (c) identify rebuttal witnesses to any witness named by Defendant; and (d) call any witness designated by Defendant as upon cross-examination.

(Id.). GeoShack never supplemented its witness list. Hendriks has moved the Court to exclude Hawthorne's testimony.

Federal Rule of Civil Procedure 37 provides that where a party fails to "identify a witness as required by Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence...at a trial, unless the failure was substantially justified or is harmless." Fed. R.

Civ. P. 37(c)(1). The purpose of Rule 26(a)(3) is to list "the witnesses who will be called by a party at trial and allow the opposing party to properly prepare to examine those witness." *Quesenberry v. Volvo Group N. Am., Inc.*, 267 F.R.D. 475, 480, 2010 U.S. Dist. LEXIS 39025, *11 (W.D. Va., April 20, 2010). Plaintiff failed to identify Hawthorne as a witness as required by Rule 26(a) or (e) and thus is prohibited by Rule 37 from using the witness's testimony unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1).

Five factors are used in determining whether an omitted or late disclosure is "substantially justified" or "harmless":

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Serve., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014)). The Federal Rules of Civil Procedure confer very broad and comprehensive discretion by district courts over the management of all pretrial activities, especially discovery and scheduling. *Id.*

Hendriks asserts the failure was neither justified nor harmless:

> GeoShack argues they should be able to rely on Hawthorne because someone else, *Hendriks*, disclosed him in his initial disclosures and witness disclosures. But Hendriks' inclusion of Hawthorne does not relieve GeoShack of having to disclose him. See *Oster v. Huntington Bancshares Inc.*, 2017 U.S. Dist. LEXIS 118997, *30-31, 2017 WL 3208620 (S.D. Ohio July 28, 2017). *Oster* is on point and supports the exclusion requested by Hendriks. In fact, the circumstances in *Oster* are less egregious than the current case.
>
> In *Oster*, Chief Judge Marbley excluded witnesses the defendant included on its witness disclosures but that it never identified in its initial disclosures or discovery. Id. Like here, the

3

> party opposing exclusion argued that its disclosure failures were harmless because the movant included the witnesses on their own initial disclosures and the names of the witnesses were on discovery documents. Id., *29-30. The Court rejected these arguments and held "[u]ntil Defendant actually identified these individuals as <u>witnesses</u>, Plaintiff had little incentive to depose them or conduct written discovery. Id., *30, (emphasis in original.) Just like in *Oster*, here, Hendriks had no reason to push for discovery related to Hawthorne because GeoShack never disclosed him as a witness.

Doc. 81, PageID 1528.

The difference between *Oster* and this case is that Defendant Hendriks himself disclosed Hawthorne as a witness "with relevant knowledge" in his initial disclosures (Doc. 74-2, PageID 1393, Exhibit A) ("Mr. Hawthorne is a current employee of Plaintiffs. Defendant believes Mr. Hawthorne may testify regarding Defendant's employment and performance, as well as the value of Defendant's shares and book value of Ultara Holdings, Inc. He may also testify on all topics testified to during his deposition, if any, taken in this matter."). Plaintiff GeoShack disclosed Hawthorne, if only by incorporation, in its discovery responses to Hendriks (Doc. 74-3, PageID 1401, Exhibit B2). Unlike *Oster*, Hendriks did depose Hawthorne. The parties filed a joint motion seeking to extend the discovery cutoff until May 31, 2021, "to complete the depositions of Thomas Hawthorne, Dan O'Reilly and a 30(B)(6) deposition of Plaintiff." Doc. 74-4. Hawthorne was deposed May 19, 2021. (Doc. 71-2, PageID 1255). To the extent that Defendant wished to perform additional discovery, the Court would have granted further extensions of discovery, as it frequently does, prior to the dispositive motion deadline. Now that dispositive motions have been filed, the time for discovery disputes is closed.

Rule 37(c)(1) does require "absolute compliance" with Rule 26(a) and (e). *Oster* at *28, (quoting *Production Design Servs., Inc. v. SuthertandSchultz, Ltd.*, 2015 U.S. Dist. LEXIS 110478, 2015 WL 4945745, at *4 (S.D. Ohio Aug. 20, 2015) (quoting *Roberts ex ret Johnson v.*

*Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)). However, "It is clear from the language of the Advisory Committee Note that the concern is whether the party had knowledge of the existence of the witness." *Production Design Services, Inc. v. Sutherland-Schultz, Ltd.*, No. 3:13-CV-338, 2015 WL 4945745, at *4 (S.D. Ohio Aug. 20, 2015) (Rice, J.).

"In the absence of bad faith, nondisclosure of witnesses is harmless where the other party knows 'the names of its witnesses and the scope of their relevant knowledge well before trial.'" *Id.* (quoting *Newman v. GHS Osteopathic, Inc., v. Parkview Hosp., Div.*, 60 F.3d 153, 156 (3d Cir. 1995)). "The burden to prove harmlessness is on the potentially sanctioned party." *Nathan v. Ohio State Univ.*, No. 2:10-CV-872, 2012 WL 12985801, at *2 (S.D. Ohio Apr. 17, 2012).

Given that Defendant identified Hawthorne in Defendant's initial disclosures and set forth Hawthorne's knowledge of this case, the Court will not exclude Hawthorne's testimony. *See El Camino Res., Ltd. v. Huntington Nat. Bank*, No. 1:07-CV-598, 2009 WL 1228680, at *2 (W.D. Mich. Apr. 30, 2009) ("These [initial disclosure] provisions make it clear that a party will not be allowed to insist on exclusion of a witness whose relevance the party was already aware of, especially when that party has itself recognized the witness's importance by including him in the party's own Rule 26(a) disclosure"); *see also Jackson v. Herrington*, No. 4:05-CV-186, 2011 WL 1750800, at *2 (W.D. Ky. May 6, 2011) (finding defendant's failure to disclose witnesses harmless because plaintiff had already disclosed them). Accordingly, the Court finds Hawthorne's testimony will not be excluded. See also *Almanza v. Sessions*, 3:15-CV-389, 2018 WL 5263033, at *2–3 (E.D. Tenn. June 15, 2018).

Hendriks is correct that Rule 26 does not just require the names of persons with relevant information, but also the subjects of the witness's testimony. Fed. R. Civ. P. 26(a)(1)(A)(i). However, Hendriks always knew about Hawthorne and what information he possessed.

Hendriks's initial disclosures proclaimed "Mr. Hawthorne is a current employee of Plaintiffs. Defendant believes Mr. Hawthorne may testify regarding Defendant's employment and performance, as well as the value of Defendant's shares and book value of Ultara Holdings, Inc. He may also testify on all topics testified to during his deposition, if any, taken in this matter." (Doc. 74-2, PageID 1393, Exhibit A). Thus, Motion to Exclude by Defendant Daniel W. Hendriks, Doc. 70, is **DENIED**. Plaintiffs may call Thomas Hawthorne and use his deposition testimony at trial or summary judgment.

## II.     Motion to Stay

Next the Court considers the Motion to Stay or Defer Ruling re Doc. 69, Motion for Summary Judgment by Defendant Daniel W. Hendriks. Doc. 77. Resolution of a motion to stay is a question committed to the discretion of the Court. *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014). Reviewing courts examine a number of factors when determining whether a district court abused its discretion in failing to grant a motion for further discovery:

> [W]hen the appellant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests.

*Plott v. Gen. Motors Corp., Packard Elec. Div.,* 71 F.3d 1190, 1196–97 (6th Cir. 1995) (internal citations omitted); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008). The main inquiry is "whether the moving party was diligent in pursuing discovery." *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 478 (6th Cir. 2010); see also *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014).

Here, Defendant knew of the issues that were the subjects of the desired discovery early on in the proceedings. As to the second factor, the Court does not conjecture what would be discovered beyond Defendant's assertion that it would possibly contradict Hawthorne's testimony. The third *Plott* factor weighs in favor of denying the stay. Discovery has been pursued for nineteen months, a span that has included resolution by the Court of several disputes and the granting of numerous extensions. The fourth *Plott* factor favors denying the stay as well. Plaintiff waited until July 12, 2021, when summary judgment briefing was nearly complete, to decry conduct that took place in May. The final factor appears to weigh slightly in favor of denying the stay, as Plaintiff provided the timely-requested discovery, though Defendant decries that it was provided at the eleventh hour. Because these factors taken together weigh against relief, the Motion to Stay or Defer Ruling re: Doc. 69, Motion for Summary Judgment by Defendant Daniel W. Hendriks, Doc. 77, is **DENIED**.

## III.    Motions for Summary Judgment

The parties have filed cross-motions for summary judgment: Motion for Summary Judgment against Plaintiffs by Defendant Daniel W. Hendriks, Doc. 58; Defendant's Motion for Summary Judgment on Plaintiffs' Claim that Hendriks was Terminated "For Cause," Doc. 59; Motion for Summary Judgment by Counter-Defendants GNA Canadian Holding Company, GeoShack Canada Company, Plaintiffs GNA Canadian Holding Company, GeoShack Canada Company. Doc 69.

### A.    Background

Plaintiff GeoShack Canada Company, now known as GNA Canadian Holding Company, entered into an Employment Agreement with Defendant Daniel W. Hendriks in 2004. (Doc. 1, ¶¶ 8, 47; Doc. 20, PageID 276). As part of Hendriks' Employment Agreement and Stock Purchase

Agreement, Hendriks received shares in GeoShack. (Doc. 1-1 at PageID 10). Section 6.4 of the Employment Agreement governs what happens to those shares upon a termination of Hendriks' employment. (Id. at PageID 14-16). Upon Hendriks' resignation or termination, GeoShack had the option to redeem Hendriks' shares. (Id. at PageID 14-15, §§ 6.4(A)(ii); (B)(ii)).

GeoShack exercised its option to redeem Hendriks' shares. (Doc. 16- 4 at PageID 157; Doc. 23, PageID 391-393). The terms required GeoShack deliver Hendriks 20% of the net book value of his shares soon after he exercised his redemption right. This is true regardless of whether Hendriks resigned or GeoShack terminated him. (Doc. 1-1, PageID 14-16, §§ 6.4(A)(ii); (B)(ii)). If Hendriks resigned and GeoShack redeemed his shares, then GeoShack owed Hendriks 20% of the net book value of his shares within six months. (Doc. 1-1, PageID 14-15, § 6.4(A)(ii). On the other hand, if GeoShack terminated Hendriks—for cause or not for cause—and the redemption option was exercised, then GeoShack owed Hendriks 20% of the net book value of his shares within 60 days of the exercise date. (Id. at PageID 15-16, § 6.4(B)(ii)).

The difference between a for-cause or not-for-cause termination is that, assuming no breach of the payment terms, GeoShack has 3-years to pay Hendriks 150% of his share value if he was terminated not for cause, or 5-years 100% of his share value if he is terminated for cause. (Id. at PageID 16, § 6.4(B)(ii)). GeoShack also owed Hendriks six months' severance if Hendriks was terminated for reasons other than for cause. Doc. 1-1, PageID 15, § 6.4(B)(i).

Regardless of how Hendriks' employment ended, after the 20% payment was made, the balance of the purchase price for Hendriks' shares was to be paid over a 3-5 year period and bear interest at the prime rate of interest announced effective at the time of the termination of employment at Bank One, NA (or its successor) plus two (2) points. (Doc. 1-1, PageID 15-16 at §§

6.4(A)(ii);(B)(ii)). GeoShack was to make payments in "[a]nnual equal installments, plus accrued interest" over the next three to five years. (Id.)

Lastly, the terms of GeoShack's repayment were to be on "typical terms and conditions, including acceleration upon default." (Id.) The interest rate and value of Hendriks shares is not in dispute. (Doc. 54 at PageID 715). Also, GeoShack's CEO understood these terms and had knowledge of them. (Beathard Dep., p 29:13-32:5; 65:5-66:3.)

Hendriks got into the construction equipment sales industry by buying half of CRS Survey Equipment ("CRS"), a construction equipment sales company based in Ontario, in 1995. (Id. at 13:1–14:14, 22:10–13). Over the following eight years that Hendriks co-owned CRS, Hendriks was responsible only for outside sales, did not serve as a manager or supervisor, did not prepare budgeting or planning exercises, and neither looked at CRS's financial statements nor understood them. (Id. at 23:13–24:1, 25:4–26:25, 28:5–24; see id. at 26:20–25.)

In October 2004, GeoShack, a Texas company, acquired CRS and retained Hendriks as a Manager, a role in which Hendriks' primary responsibility was to sell products in that region. (Exhibit C, Hendriks' Response to Interrog. No. 12). After GeoShack acquired CRS in 2004, the landscape of the construction equipment industry in Canada changed causing Hendriks' managerial sales role to evolve. (Id. at 36:10–37:2). According to Hendriks, when he first started as a GeoShack sales manager, "it was a smaller business, so you had more intimacy with the transactions and the customers and the evolution of the territory and [I was] much more hands-on[,]" but, as the business grew and support staff were added, Hendriks became less involved in the "tactical" aspects of the business and more involved in the strategy. (Id.). More specifically, Hendriks was responsible for developing, improving, and executing GeoShack's business strategy to drive the sales, as well as direct selling. (Id. at 37:5–15). Thus, one of

9

Hendriks' primary responsibilities was overseeing regional "operations," like accounts receivables, logistics, and inventory. (Id.).

From 2004 to 2012, Hendriks succeeded in his sales role. As Regional Sales Manager of Ontario from 2004 to 2012, Hendriks was responsible for increasing revenues and market share, monitoring and maintaining inventory, and ensuring that his region's gross sales margin exceeded 40%, while operating margin exceeded 10%. Based on Hendriks' performance numbers from 2004 to 2011, Hendriks achieved each of those performance goals. (Exhibit D; Exhibit E at 1). Hendriks' personal sales were good and growing, and the Ontario region's sales goals were being met. (Exhibits D & E). In fact, in 2010 and 2011, Hendriks surpassed his annual sales goal by $2,024,783 (21.3%) and $3,138,021 (27.1%), respectively. (Exhibit D). Hendriks' performance metrics appeared so good that, at Hendriks' insistence, GeoShack opened two new locations in Quebec (Quebec City and Montreal) and put Hendriks in charge of those operations with the goal of expanding GeoShack's market share throughout that region. (Exhibit E at 1).

In 2012, Hendriks missed his sales goals—which Hendriks helped set—by $2,190,782, or -12.5%. (Id.). By comparison, all of GeoShack's other primary regions cumulatively exceeded their sales goals that year by 9.2%. (Exhibit F at 2). (See Exhibit D). Hendriks missed his annual sales targets by over one million dollars every year thereafter:

| Year | Amount Under Target | Percentage Under Budget |
|------|---------------------|-------------------------|
| • 2013: | $3,033,059 | (-17.7%) |
| • 2014: | $1,478,422 | (-9.7%) |
| • 2015: | $3,434,223 | (-19.1%) |
| • 2016: | $12,160,212 | (-36.4%) |
| • 2017: | $2,190,932 | (-72.7%) |

• 2018:          $1,158,567                    (-87.8%)

(See Exhibit D).

Hendriks' sales performance prompted GeoShack to visit and investigate Hendriks' projects in the Ontario and Quebec regions. (Exhibit E at 1; Exhibit G, Hawthorne Dep. at 36:22–25). Over a three-year period, from 2012 to 2015, GeoShack discovered that Hendriks' leadership had created a culture of not following GeoShack's institutional rules and policies. (Id. at 117:9–121:16). GeoShack found that Hendriks ignored accounting principles and company policies when Hendriks would authorize excessive discounts and credit terms on products, violate revenue recognition rules, and disregard inventory controls, all of which inflated Hendriks' actual sales numbers and "killed [GeoShack] on the bottom line." (Hawthorne Dep. at 48:9–49:16; id. at 80:13–81:17 (excessive credit, improper revenue and inventory records); id. at 74:15–79:13 (inventory issues); see also Beathard Dep. at 213:25– 215:7 (excessive discounts and credit terms)). Pricing, accounting, and logistics are fundamental to any sales role. Hendriks' mistakes and errors in managing GeoShack's Ontario and Quebec regions were also systemic. (Id. at 213:25–215:7; Ex. G, Hawthorne Dep. at 74:15– 79:13).

Starting with any given sale, Hendriks would offer excessive discounts and unworkable credit terms that significantly cut into GeoShack's profit margins. (Beathard Dep. at 213:25–215:7). Next, Hendriks allowed customers to take possession of products before the customers paid, which often led to substantial write-offs, and thus bottom-line losses to GeoShack. (Exhibit G, Hawthorne Dep. at 79:14–81:17). Moreover, Hendriks invoiced and reported sales before those products were delivered, and, in one instance, before the customer had even agreed to purchase the products. (Id.). Finally, Hendriks incorrectly serialized products; serialized products went missing; non-serialized products were mishandled; Hendriks allowed customers to "lease" GeoShack's

11

products for free, which reduced the value of GeoShack's inventory without receiving any revenue; Hendriks failed to ensure that purchased products were ever delivered to customers; and Hendriks applied trade-in credits to customers who had never traded in anything to GeoShack. (Id. at 74:15–81:17; Exhibit E at 2–3).

GeoShack had to make significant investments in the Ontario and Quebec regions in 2013 and 2014 to attempt to fix the situation. (Exhibit G, Hawthorne Dep. at 72:9– 77:2). Those investments included hiring an accounting manager and inventory specialist, as well as opening a separate warehouse to prevent Hendriks from mishandling inventory and subverting rules and procedures. (Id. at 74:15–77:2). These investments in personnel and management support for Hendriks proved unsuccessful, as Hendriks never reached his sales goals in the Quebec region, failed to recruit, hire, and train a single sales manager, and, at one point, "operated" one of the two locations within the Quebec region for months at a time without a single employee working there. (Exhibit E at 2; see also Exhibit H, Beathard Nov. 20, 2015 Email to Hendriks ("I need solid ideas from you and a commitment to overcome the ongoing chronic problems with inventory and AR across [GeoShack Canada] and the persistent issue of underqualified personnel on the counter and in the warehouse in Toronto.").

On March 16, 2015, Beathard encouraged Hendriks to address "operational issues in Ontario" and a "recruiting problem in Quebec," warning "in 2015, you will be held responsible for final bottom line results in Quebec." (Doc. 69-10, PageID 1093, Exhibit I at 1). From 2012 to 2015, GeoShack's Ontario and Quebec regions were forced to: (1) write off more than $500,000.00 in receivables, (2) write off approximately $2,300,000.00 in inventory, and (3) credit more than $6,200,000.00 in sales. (Doc. 69-6, Exhibit E at 1). Ultimately, GeoShack winded down

its operations in the Quebec region, after the operating losses there totaled nearly $3 million in just eight years of existence. (Hawthorne Dep. at 117:9– 20; Exhibit J at 1).

After GeoShack learned of Hendriks' performance issues related to sales, accounts receivables, and inventory management from 2012 to 2015, GeoShack also discovered Hendriks was failing to effectively lead the GeoShack employees who reported to him. For example, Hendriks would pass his supervisory duties onto other senior employees and create his own operational structures, job duties, pay scales, and commissions that conflicted with GeoShack policies and procedures. On September 16, 2015, Beathard wrote Hendriks:

> Dan,
>
> You must formally stop using Dave…in any kind of supervisory role immediately. All of the GCC bench and field techs must be managed and directed by you. He is not to set schedules or priorities for other techs. As a senior guy, he can and should help train new guys, but no day-to-day management of others.
>
> Yes, you guys are being lambasted by Paul G down here on a variety of issues. Big part of his claim is that you had him do things not in his job duties, including managing the other guys.
>
> So, this job creep at GCC stops now please.
>
> And GCC must standardize to all of our policies and procedures – including operational structures, job duties, pay scales, commissions, EVERYTHING.

(See Doc. 69-12, PageID 1100, Exhibit K). Hendriks was such an absent "leader" and so difficult to contact that his coworkers dubbed him "the Ghost" because "he was never around." (Ex. C, Hendriks' Response to Interrogatories No. 13; Ex. L; Beathard Dep. at 221:14–21). Several GeoShack employees quit because Hendriks was their manager. (Id. at 113:2–117:2; Hendriks' Dep. I at 107:11–18; Exhibit G, Hawthorne Dep. at 120:12– 121:8).

In late 2015, while the extent of Hendriks' shortcomings was being discovered, Hendriks began struggling with "personal issues" related to his family. (Beathard Dep. at 329:1– 4). To help alleviate Hendriks' stress, and at Hendriks' request, in 2016, GeoShack merged its Ohio and Michigan regions with Hendriks' Ontario and Quebec regions (collectively the "Eastern District"), so that Hendriks would travel less, receive more management support, and benefit from working with detail-oriented managers who would offset Hendriks' weaknesses in that area. (Exhibit G, Hawthorne Dep. at 60:20–62:11; Exhibit E at 2). Rather than collaborate with this additional support staff, however, Hendriks ostracized his GeoShack team.

While approving a credit request that was forwarded to Hendriks through two female employees, Hendriks signed off and added "–F--- you–" below his signature. (See Doc. 69-14, PageID 1103, Exhibit M at 2). As one of the employees thought it was directed at her, GeoShack's Chief Financial Officer, Robert Makenas, wrote to Hendriks, "I am also under the understanding that this may not be the first time this has occurred…. Angie, Tracey, Dahlia, Linda, and Cathy are there to support you and your sales team, your actions and words are not supporting th[ei]r efforts." (Id., PageID 1104).

Throughout 2016, Hendriks consistently acted in ways that were "unacceptable, unprofessional, unethical, and [with] a complete lack of judgement and character on [his] part." (Id.). Hendriks' actions, and inactions in failing to provide leadership, drove away the Ohio and Michigan teams that his predecessor, Dan O'Reilly, had recruited and developed in 2014 and 2015. (Hendriks' Dep. at 107:11–18; Beathard Dep. at 113:2– 117:2).

In an August 24, 2016 email that Beathard sent to Hendriks, Beathard stated, "[t]he new District Manager compensation structure is obviously not working as planned yet. It is taking more time than expected to get all cylinders firing together." (Exhibit L at 1). Beathard then explained

that "[i]f you can quickly place either two Selling Managers in OH & MI or a full-time Regional Manager over both, you will no doubt magnify your efforts there and free you up more to work on ON & QC." (Id.). Despite this advice, Hendriks did not place any selling managers or regional managers in Ohio or Michigan. (Hendriks' Dep. II at 93:1–15).

A few months later, on January 20, 2017, Beathard sent Hendriks a letter that set forth Hendriks' transition from the Eastern District to a new position with new primary responsibilities in the Mining Division. (Doc. 69-15, Exhibit N). Hendriks' responsibilities as Senior Vice President and Manager of the Mining Division included:

> 1. To successfully and profitably distribute all defined mining products in our GeoShack Mining business.
>
> 2. To manage all aspects of this new business venture, including vendor relationships.
>
> 3. To professionally manage and proactively drive sales and exceed baseline sales plans monthly.
>
> 4. To implement and utilize daily our sales management CRM system within NetSuite that will ensure a strong activity level that results in thorough territory and product line coverage from all team players; and track the individual deals that your reps need to achieve their monthly plans.
>
> 5. To review and approve all quotes/estimates in NetSuite, before issuing to a prospective customer, but after the costs and therefore the margins are correct.
>
> 6. To communicate to me weekly in writing on key strategic, marketing, sales updates, personnel issues and operational issues.
>
> 7. To follow and implement all company policies, whether sales, margin, inventory, commissions, credit, collections, personnel or PTO related.
>
> 8. To design and implement GeoShack Advantage value added service programs customized for Mining.

9. Achieve gross margins in the 40–45% range, blended with value added services.

10. Control operating expenses and enforce expense policy.

11. Maintain adequate but not excessive inventory levels.

12. Maintain accounts receivable to 30 days DSO or below.

13. Return a minimum pre-tax Operating Income of 10%.

(Id.).

Despite Hendriks' willingness to take on the role, Hendriks failed to perform virtually any of his Mining Division responsibilities in 2017 and 2018. (See Exhibits D, E, F, and J). The Mining Division's gross margin in 2017 was well under the "40–45% range" at only 30.73%, and its operating margin was negative, at -0.39%. (Exhibit J at 5). Hendriks fell short of his annual sales goal by $2,190,932 (or -72.7%). (Id.). Moreover, from an inventory control standpoint, nearly $30,000 of the Mining Division's inventory was lost in 2017. (Exhibit F at 1). GeoShack's only two sales representatives who worked there at the time left. (Exhibit E).

Then, Hendriks terminated GeoShack's relationship with all of its Mining Division vendors, save one. (Id.). That one remaining vendor only offered one product for GeoShack to sell. (Id.). Unsurprisingly, the following year, the Mining Division—run by Hendriks—sold less than $50,000 of products, and operated at a loss of $158,051, or -97.91%. (Exhibit J at 5).

By the end of the 2017, Hendriks was failing at his second new role in two years. So, on November 27, 2017, Beathard emailed Hendriks about Hendriks' performance. (Exhibit O). Beathard explained to Hendriks that "the Mining business is not growing fast enough to justify your full[-]time efforts. So going forward, you must either ramp up faster and therefore the path to profitability or take on additional responsibilities." (Id.).

16

Beathard listed four optional roles for Hendriks. (Id.). From the four options, Hendriks remained a sales manager in GeoShack's Mining Division and Specialty Retail Group and took on the additional role of a sales manager for GeoShack's Survey Sales team. (Exhibit P). Hendriks reported to Beathard for his work related to the Mining Division and Specialty Retail Group, and Hendriks reported to Dan O'Reilly for his work related to the Survey Sales team. (Id.).

GeoShack reduced Hendriks' annual sales target for the Mining Division by more than half to reflect the additional responsibilities that Hendriks gained as manager for the Survey Sales team. (Exhibit D). Hendriks' performance did not improve. (Doc. 69-18, Exhibit Q; see also Doc. 69-6, Exhibit E).

On November 1, 2018, Beathard sent Hendriks a letter (the "Default Letter"), formally notifying Hendriks that, based on his lack of performance, he was in material breach of his Employment Agreement. (Exhibit Q at 1–2). That letter read:

> This letter provides you with formal notice of that you are in material breach of your Employment Agreement with GeoShack Canada Company.
>
> There has been a lack of performance on your part that places you in material breach of the Employment Agreement. Even though we have attempted over the last three years to find a suitable position within our organization for you, I think that you will agree that you have not been successful in any of those attempts.
>
> In 2016, we removed you from the operational side of GCC, our GS Retail business in Canada and opened a separate warehouse to control and protect our assets; and then expanded your sales management role to include Ohio and Michigan as well as Ontario and Quebec. Even though Mr. O'Reilly made great progress in Michigan in 2014 und 2015 to tum it around and build a team, you proceeded to unravel all the progress he made in Michigan in just months. So we had to remove you from that management responsibility before it impacted more of our GS Retail business, especially in Ohio.

17

In 2017, we transferred you over to lead our NA Mining business in which you quickly drove away both of the sales professionals on staff, which to this day you have not replaced. And you ended our relationships with all but one vendor partner. Today you are the only sales representative for that business with only one product, and it is no surprise that we are at all time low in sales in 2018 losing money in that business; and you have given us no credible ideas to fix it. You were also asked to research potential acquisition targets in the sector, our goal was to find another business for you to operate for us and hopefully be successful again. While you did present a few ideas, you did not put serious effort into driving any deals or conducting any substantial due diligence.

In early 2018, to help justify your continued employment as a Senior Manager with our company, you were asked to take on additional duties to manage and grow our Survey Sales business in Ontario along with your Mining responsibility. While you have made some personal sales, you have not placed and trained a Survey sales specialist to date; and we cannot continue to pay you as a Senior Manager to do the job of a sales rep.

Dan, we have had many discussions about these issues and you have been given many opportunities to turn these situations around, but to no avail. Effective immediately you are placed on administrative leave for the next thirty (30) days. During this period, please propose to me a plan to cure your past performance failures to determine whether your employment will continue after this thirty (30) day period or be terminated for Cause at that time.

My offer to meet in person next Tuesday, Nov. 6 still stands.

Sincerely,

P. Scott Beathard

Doc. 69-18, PageID 1111-12.

Hendriks received the Default Letter and responded via email on November 4, 2018.

Dear Scott,

This letter is in response to your correspondence of November 1, 2018 and subsequent email of November 2, 2018.

18

I contacted you on October 29, 2018 for the purpose of arranging a face-to-face meeting to tender my resignation from GeoShack. I offered to fly to Dallas to meet with you on November 2nd but you indicated you were unavailable and instead suggested meeting on November 5th or 6th, In the meantime, you prepared and forwarded me a letter, dated November 1, 2018, setting out reckless and misleading claims about my performance, placing me on a 30-day administrative suspension, and freezing my email account. At no time prior to receipt of this letter did you indicate a concern about my performance.

It Is quite apparent you anticipated my resignation, and in order to avoid GeoShack's contractual obligations under the Close Corporation Agreement of October 14, 2003 ("CCA"), you claimed that I am in material breach of my employment agreement. The claims relating to my performance made in your November 1st letter do not represent my contribution to the organization.

My response to your comments about my 2018 performance are as follows:

• I have grown the survey business by 154% from the same period in 2017. Comparatively, the entire retail business has declined more than 5% over the same period

• Adam Tyler left our employment in April 2018 and I have offered a number of candidates the position; a six month vacancy in a position is not unique at this company

• Our mutually-agreed-upon 2018 plan did not contemplate any new head counts, acquisitions or product additions

• In early 2018, I was instrumental in collecting $235,400 of $242,900 of delinquent Quebec AR per your direct request

• 100% of our Teledyne units sold in the mining business in the last 18 months have failed as a result of product deficiencies, creating significant sales resistance which was not anticipated. You were made aware of these product failures.

Notwithstanding the above, I intend to meet with you on November 6, 2018, as agreed, in the hopes we can engage in a meaningful, good faith discussion about next steps. In the meantime, it is my intention to continue carrying out my day-to-day obligations to

> GeoShack customers. As per your request, I will keep you apprised
> of such activities.
>
> Yours truly,
>
> Dan Hendriks

(Doc. 69-19, PageID 1113-14, Exhibit R at 2).

The Court notes Hendriks only responded to his inadequate performance in 2018, not mentioning his performance in 2016 and 2017, or earlier. (See id.). Moreover, having been instructed that he was on administrative leave, he proclaims that he will "continue carrying out my day-to-day obligations to GeoShack customers," which is somehow "[a]s per your request."

On November 21, nearly three weeks after Hendriks responded to Beathard, Hendriks sent another email to Beathard, in which Hendriks stated that, "[i]t is my view that the substance of [the Default Letter] and actions you have taken on behalf of the corporation constitute constructive dismissal of my employment." (Exhibit S at 2). Hendriks continues, "You have placed me on an 'administrative leave' for 30 days. This is tantamount to an unwarranted disciplinary suspension." (Id.). Hendriks claims that "at no time throughout my fourteen years with the company have you given me any prior warnings regarding my performance." (Id.). Hendriks concludes: "I have been directed that I am expected to create a business plan acceptable to you to 'cure' my alleged 'past performance failures' in order to attempt to salvage my employment, failing which I have been threatened that I will be terminated for cause. Again, this is humiliating. I believe this direction was made in bad faith and that the company does not have any true intention of continuing my employment." (Id.).

On November 28, 2018, again Hendriks wrote to Beathard, "[u]nfortunately your action of Nov. 1 has made it impossible for me to continue at GeoShack." (Exhibit T at 2). That same day,

Beathard emailed Hendriks, asking "[w]hile on leave, have you come up with any new ideas on potential roles that would fit your situation and resolve our issues?" (Id.). On December 2, 2018, Beathard sent Hendriks an email that stated, "[s]ince we finally received your new personal contact information from you and your clarification that you do not intend to return to work through these issues and have not proposed a corrective plan, we consider you to be terminated for cause, effective Nov. 30, 2018 – the end of your paid administrative leave period." (Exhibit U at 2).

After Hendriks' employment with GeoShack ended, on December 18, 2018, GeoShack sent Hendriks notice that it would redeem/purchase his shares. (Doc. 16-4 at PageID 157.) To date, GeoShack has not paid Hendriks for his shares. (Hendriks Decl., ¶¶ 6-7, Beathard Dep., p. 294:13-23.

On March 26, 2019, Hendriks' counsel wrote GeoShack stating that Hendriks disagreed that he was fired for cause and informed GeoShack that even if Hendriks was fired for cause, GeoShack still owed him 20% of his shares. (Doc. 58-3, PageID 740, Ex. A, March 26, 2019 Letter at 3; Hendriks Decl., ¶ 9). The Letter asked that GeoShack pay 20% of the amount GeoShack was offering to resolve their dispute, a payment that was then arguably two months past due. (Id.) Then, in June of 2019, counsel for Hendriks wrote GeoShack again stating that it was in default of the Employment Agreement for failing to deliver 20% of what it owed Hendriks following GeoShack's December 2018 share redemption. (Doc. 58-3, Ex. B, June 28, 2019 Letter p. 1; Richards Decl., ¶ 2). A few weeks later, Hendriks' counsel sent GeoShack a "Notice of Default" declaring GeoShack in default, requested the minimum amount owed be paid, and declared all outstanding amounts due accelerated. (Doc. 58-3, Ex. C, July 8, 2019 Notice of Default at pp. 1-2; Richards Decl., ¶ 2). Six months later, Hendriks' counsel wrote GeoShack's counsel again

reminding GeoShack of its continued breach of the Employment Agreement because of its failure to pay 20% of the disputed amount. (Doc. 58-3, Ex. D, February 6, 2020 Letter at p. 2; Richards Decl., ¶ 2). In April of 2020, Hendriks himself wrote GeoShack stating that GeoShack was in default, accelerating the debt, and demanding the 20% be paid. (Doc. 58-3, Ex. E, April 2, 2020 Letter; Hendriks Decl., ¶¶ 8-10). Hendriks' counsel also forwarded this default letter to GeoShack counsel. (Doc. 58-3, Ex. F, April 2, 2020 Email; Richards Decl., ¶ 2). Finally, in mid-March of 2021, Hendriks' counsel sent all the above default notices to GeoShack's new counsel and again sought payment. (Doc. 58-3, Ex. G, Emails forwarding Default Correspondence; Richards Decl., ¶ 2).

On May 24, 2019, GeoShack Canada Company sued Hendriks asserting breach of contract and seeking declaratory judgment that Hendriks was terminated for cause. (Doc. 1). On August 20, 2019, Hendriks answered, asserting a counterclaim breach of contract and seeking declaratory judgment. Doc. 10.

## B.    Legal Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)). Summary judgment must be entered "against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.,* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson,* 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure,* § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

The instant case involves questions of state law. In reviewing an Ohio claim, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v.*

*Guardsman Prods. Inc.,* 141 F.3d 612, 617 (6th Cir. 1998). Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore,* 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.,* 145 F.3d 804, 808 (6th Cir. 1998). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.,* 27 F.3d 188, 191 (6th Cir. 1994).

Finally, in ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## C.  Argument

The factual issues that impact the redemption value of Hendriks' shares are: (1) whether Hendriks was terminated "for cause"; (2) the "Purchase Price" of the shares—a term from the Employment Agreement—and dictated by the value of the shares and date of valuation; and (3) whether interest is appropriate under the Employment Agreement.

Five of the Employment Agreement's provisions are relevant to determining whether Hendriks was fired for cause, fired not for cause or resigned. First, § 2.3 provides that Hendriks "will have such duties as are assigned and delegated to the Employee by the President of the Employer." (Id. at 3). Further, § 2.3 states that Hendriks will use his best efforts to promote GeoShack's success and "will fully cooperate with the President in advancement of" GeoShack's best interests. (Id.). Thus, Hendriks' obligations under the contract are found in GeoShack's letters

and emails to Hendriks that outlined Hendriks' duties for position. (See, e.g., Exhibit L at 1, Exhibit J at 2).

The second relevant provision is § 6.1, titled "Events of Termination," that provides four ways that Hendriks' employment at GeoShack could end. Only two are relevant here: (1) "for cause (as defined in Section 6.3), immediately upon notice from the Employer to the Employee, or at such later time as such notice may specify"; or (2) "immediately upon notice of resignation from the Employee to the Employer, or at such later time as Employee and Employer may agree." (Exhibit A at 4).

Third, § 6.3 of the Employment Agreement, titled "Definition of 'For Cause'," sets forth five ways that Hendriks could be subject to termination "for cause." The two that are relevant emphasize written communication: (1) "the Employee's material breach of this Agreement, provided that the Employee shall have been given written notice by the Employer of such alleged breach and shall have failed to cure such breach within 30 days after date of such notice"; and (2) "the Employee's failure to adhere to any written Employer policy if the Employee has been given a reasonable opportunity to comply with such policy or cure his failure to comply within 30 days after written notice." (Id. at 5).

Fourth, § 6.4, titled "Termination Pay and Stock Purchase After Termination," provides GeoShack's obligations to pay Hendriks, which depend entirely upon the reason Hendriks' employment was terminated and whether Hendriks completed the necessary conditions precedent. More specifically, § 6.4 states that, if GeoShack terminates Hendriks for cause, then the purchase price of Hendriks' shares is 100% of the shares' net book value. (Id. at 6–7). In contrast, if GeoShack terminates Hendriks for reasons other than for cause, or if Hendriks voluntarily terminates his employment, the purchase price of Hendriks' shares is 150% of the shares' net book

25

value, plus six-months of Hendriks' salary. Moreover, if GeoShack terminates Hendriks for reasons other than for cause, then Hendriks was required to sign a release of "all employment or other claims" against GeoShack and its affiliates. (Id. at 6).

The fifth applicable section of the Employment Agreement is § 9.6, that provides: "[a]ll notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when": (1) delivered by hand, (2) sent by fax and registered mail, or (3) sent by a nationally recognized overnight delivery service. (Id. at 8).

The Employment Agreement states that GeoShack may terminate Hendriks "for cause" upon Hendriks' "material breach of this Agreement." (Employment Agreement at § 6.3). Moreover, the Employment Agreement defines Hendriks' "duties" as the responsibilities assigned to Hendriks by GeoShack President Scott Beathard, as well as Hendriks' full cooperation with Beathard and Hendriks' best efforts towards GeoShack's success. (Id. at § 3.1). Thus, to determine whether Hendriks materially breached the Employment Agreement—and thus whether GeoShack terminated Hendriks "for cause"—requires review of the responsibilities that Beathard assigned to Hendriks. Those are stated in letters that Beathard sent to Hendriks when Hendriks' roles at GeoShack changed each year in 2016, 2017, and 2018. Some of the duties that Hendriks was assigned as Vice President and Sales Manager of GeoShack's Mining Division in 2017 and 2018, along with the objective measures of his performance related to those key duties:

| Hendriks' Duties as Mining Division Vice President and Sales Manager | Hendriks' 2017 Performance | Hendriks' 2018 Performance |
|---|---|---|
| To successfully and profitably distribute all defined mining products in our GeoShack Mining business. | Total Sales: $823,317.95 Operating Profit: -0.39% (-$3,243.43) | Total Sales: $161,432.57 Operating Profit: -97.91% (-$158,051.98) |
| To manage all aspects of this | Lost all but one vendor | Acquired no new vendors |

26

| new business venture, including vendor relationships. | | |
|---|---|---|
| To professionally manage and proactively drive sales, and exceed baseline sales plans monthly. | Missed Annual Sales Goal by $2,190,931 (-72.7%) | Missed Annual Sales Goal by $1,158,567 (-87.8%) |
| To follow and implement all company policies, whether sales, margin, inventory, commissions, credit, collections, personnel or PTO related. | Inventory issues continued | Inventory issues continued |
| Achieve gross margins in the 40–45% range, blended with value added services. | 30.73% Gross Profit Ratio | 11.03% Gross Profit Ratio |
| Control operating expenses and enforce expense policy. | 31.13% Expense Ratio (Compared to Total Sales) | 108.93% Expense Ratio (Compared to Total Sales) |
| Maintain adequate but not excessive inventory levels. | $27,371 in Inventory Losses (4.1% of 2017 Product Sales) | $3,435 in Inventory Losses (6.9% of 2018 Product Sales) |
| Return a minimum pre-tax Operating Income of 10% | -0.39% (-$3,243.43) | -97.91% (-$158,051.98) |

Reviewing the stated duties and performance goals, Hendriks failed to perform the essential duties of his role in the Mining Division in 2017 and 2018. In addition to Hendriks' performance resulting in unsatisfactory financials, Hendriks also failed to perform his managerial responsibilities. He lost sales representatives and support staff. As Beathard testified, losing employees would have been acceptable if Hendriks had recruited, hired, and trained new employees to fill those openings. Instead, Hendriks had vacant positions across GeoShack's regions. Hendriks can be held responsible for bottom-line financial results in the divisions where he worked. Hendriks failed to substantially perform his essential duties; failed to fully cooperate with Beathard; and failed to put forth his best efforts to support GeoShack's success. Accordingly,

Hendriks materially breached the Employment Agreement, and GeoShack had a right to terminate Hendriks for cause under the terms of the Employment Agreement.

GeoShack complied with the contractual provision that they give Hendriks a chance to identify how he would try to cure his performance. Hendriks did not do that. Instead, Hendriks, waived his right to cure.

Under Ohio law, a breach is material when the injured party will be deprived of the benefits that it reasonably expected. Hendriks' breaches were material because he did not substantially perform his job duties. "A party is in substantial compliance with its promises only when its deviations are 'nominal,' 'trifling,' 'technical,' 'slight,' and consistent with 'an honest effort to perform.'" *Ehrhardt v. Hamilton Fan & Blower Co.*, No. C-850265, 1986 WL 3423, at *5 (Ohio Ct. App. 1986) (quoting *Ohio Farmers Ins. Co. v. Cochran*, 104 Ohio St. 427, 135 N.E. 537 (Ohio 1922)) (cleaned up). A breach is material when he violates a specific promise and that violation amounts in a nearly 20% loss of the total benefit contemplated by the parties. *Ehrhardt*, 1986 WL 3423, at *5.

Here, Hendriks' performance under the Employment Agreement directly resulted in more than a 20% loss. GeoShack lost in excess of $3 million from 2009 to 2018. (Exhibit G, Hawthorne Dep. at 117:9–20; see also Exhibit J at 1). Setting aside Hendriks missing his annual sales targets every year from 2012, until his termination in 2018 (which totaled a variance of over $25 million), Hendriks' refusal to follow inventory protocols and revenue recognition procedures cost GeoShack millions of dollars on the bottom-line.

From 2012 to 2015, Hendriks operated the Ontario and Quebec regions, where GeoShack credited $6.2 million in sales, exceeded the expense budgets by more than $2 million, and wrote off $500,000 of accounts receivables and approximately $2.3 million in inventory. Similarly, in

2016, Hendriks caused GeoShack to write off $40,000 in accounts receivables and $600,000 in inventory. And Hendriks' Ontario and Quebec regions that year exceeded its expense budget by more than $144,000.

With Hendriks at the helm of the Quebec region from 2009 to 2016, the total operating loss there was more than $2.8 million. (Exhibit J at 1). This pattern of losing money continued when Hendriks moved to the Mining Division in 2017 and 2018, when that operation lost money both years, totaling more than $161,000. Thus, the majority of regions that Hendriks was in charge of operated at a loss when he was there. GeoShack suffered tens of millions of dollars in losses. Hendriks deprived GeoShack of the benefit that it reasonably expected—to operate at a return of 10% or higher, which Hendriks achieved early in his career at GeoShack. Thus, Hendriks materially breached the Employment Agreement by failing to adequately perform his essential duties.

GeoShack notified Hendriks in writing and provided 30 Days to cure deficiencies. The Default Letter that GeoShack emailed to Hendriks on November 1, 2018, properly notified Hendriks that he had materially breached the Employment Agreement, for his specific failures, and that he was placed on paid administrative leave for 30 days, during which Hendriks was required to propose a plan to cure his material breaches or otherwise risk termination for cause.

Hendriks argues that, because the Employment Agreement the parties entered in 2004 sets forth several specific methods that qualify as effective notice, none of which mention sending notice via email, GeoShack did not properly notify Hendriks of his breaches with the Default Letter. Under Ohio law, the "failure to comply with a contractual notice provision may be harmless if actual or constructive notice is nonetheless accomplished." *Simplifi Health Benefit Mgmt. v. Cayman Islands Nat'l Ins. Co.*, No. 2:13-CV-714, 2016 WL 4131857, *6 (S.D. Ohio Aug. 2,

2016). That is, "[e]ven if written notice is required, where there is evidence of actual notice, a technical deviation from a contractual notice requirement will not bar the action for breach of contract brought against a party that had actual notice. *MRI Software, LLC v. West Oaks Mall FL, LLC*, 116 N.E.3d 694 (Ohio Ct. App. 2018) (quoting *Gollihue v. Nat'l City Bank*, 2011-Ohio-5405, 969 N.E.2d 1233, ¶ 22 (Ohio Ct. App. 2011)). Given that Hendriks sent several messages to GeoShack about the Default Letter after he had received the Letter, there is no genuine dispute that the Default Letter actually notified Hendriks that he had materially breached his Employment Agreement and had 30 days to cure or otherwise be terminated for cause. (Hendriks' Dep. I at 58:18–22; see also Exhibit R at 1–2).

Hendriks sent responsive emails to GeoShack on November 4, 21, 22, 29, and 30. And Hendriks admitted in those emails that, via the Default Letter, he had "been directed … to create a business plan acceptable to [GeoShack] to 'cure' [his] alleged 'past performance failures' in order to attempt to salvage [his] employment, failing which [he would] be terminated for cause." (Exhibit S at 2). Thus, Hendriks clearly had actual notice of the Default Letter, and Hendriks' complaints that GeoShack sent the Default Letter by email is a "nominal, trifling, [and] technical departure that hardly destroys the value or purpose of the contract." *Medpace, Inc. v. InspireMD, Inc.*, No. 1:16-cv-830, 2019 WL 1109352, at *8 (S.D. Ohio 2019) (citation omitted). Because Ohio law does not require strict compliance with the delivery of the Default Letter, GeoShack notified Hendriks that he had materially breached the Employment Agreement on November 1, 2018.

Hendriks further materially breached the employment agreement and did not act in good faith by failing to attempt to cure his material breaches. One of Hendriks' duties under the Employment Agreement was to fully comply with the President of GeoShack. Yet when Beathard, the President of GeoShack, notified Hendriks of his material breaches on November 1, 2018, and

further instructed Hendriks to propose a cure or face termination for cause, Hendriks did not. That refusal is an independent breach of the Employment Agreement, and thus independently establishes "for cause" termination. Moreover, Hendriks' refusal to even attempt to cure his performance failures while he was on the 30-day paid administrative leave also illustrate Hendriks' failure to act in good faith.

"The purpose of giving notice of breach is to allow the breaching party to cure the breach and thereby avoid the necessity of litigating the matter in court." *Bunn v. Navistar, Inc*., 797 F. App'x 247, 252 (6th Cir. 2020) (quoting *Alvarez v. Chevron Corp*., 656 F.3d 925, 932 (9th Cir. 2011)). "A court should confine the application of the doctrine of substantial performance to cases where the party has made an honest or good faith effort to perform the terms of the contract." *Klaus v. Hilb, Rogal & Hamilton Co.*, 437 F. Supp. 2d 706, 730–31 (S.D. Ohio 2006).

Hendriks ignored GeoShack's notice of breach, not attempting to cure those breaches, contrary to the notice and right-to-cure provisions of the contract. By refusing to fully cooperate with Beathard's demand to propose a plan to cure, Hendriks materially breached the Employment Agreement again. Accordingly, GeoShack permissibly terminated Hendriks for cause for that second, independent breach.

Finally, Hendriks filed a Motion for Default Judgment (Doc. 58), seeking a declaration that GeoShack has "defaulted" on its obligation to pay for Hendriks' shares. Because a "net book value of shares" has not been established, GeoShack is not in default. The Employment Agreement states that: "[t]he purchase price will be paid 20% within six (6) months and the balance evidenced by a promissory note of which will be unsecured and bear interest at the prime rate of interest announced effective at the time of the termination of employment at Bank One, NA (or its successor) plus two (2) points" (Employment Agreement at § 6.4(A)(ii), Exhibit A at 6–7).

The parties have stipulated to the net book value of the shares, depending on the day Hendriks' employment was terminated:

> a. October 31, 2018: (i) $50,737.00 (at a 100% net book valuation); (ii) $76,105.50 (at a 150% net book valuation);
>
> b. November 30, 2018: (i) $52,855.00 (at a 100% net book valuation); (ii) $79,282.50 (at a 150% net book valuation);
>
> c. December 31, 2018: $54,765.00 (at a 100% net book valuation); (ii) $82,147.50 (at a 150% net book valuation);
>
> 4. The prime rate of interest announced effective as of October 31, 2018 and November 30, 2018 at Bank One, NA (or its successor JPMorgan Chase) plus two (2) points is 7.25%.

Doc. 54, PageID 715. Which share value pertained to the redemption has been in dispute until now. Thus, GeoShack has not been in default.

Hendriks was terminated for cause, effective November 30, 2018–the end of his paid administrative leave period. The parties' agreement states [t]he purchase price will be paid 20% within six (6) months and the balance evidenced by a promissory note of which will be unsecured and bear interest at the prime rate of interest announced effective at the time of the termination of employment at Bank One, NA (or its successor) plus two (2) points" (Employment Agreement at § 6.4(A)(ii)

Thus, Hendriks is entitled to $52,855.00 per share of stock and 7.25% interest from six months from November 30, 2018. That is, interest accrues from May 30, 2019. To this extent the Court will grant Motion for Summary Judgment against Plaintiffs by Defendant Daniel W. Hendriks. (Doc. 58).

**IV.      Conclusion**

The Court **GRANTS IN PART** Motion for Summary Judgment against Plaintiffs by Defendant Daniel W. Hendriks, Doc. 58, **AWARDING** Hendriks $52,855.00 per share of stock and 7.25% interest from May 30, 2019; **DENIES** Defendant's Motion for Summary Judgment on Plaintiffs' Claim that Hendriks was Terminated "For Cause," Doc. 59; **GRANTS** Motion for Summary Judgment by Counter-Defendants GNA Canadian Holding Company, GeoShack Canada Company, Plaintiffs GNA Canadian Holding Company, GeoShack Canada Company, Doc 69; **DENIES** Motion to Exclude by Defendant Daniel W. Hendriks, Doc. 70; and **DENIES** Motion to Stay or Defer Ruling re 69 Motion for Summary Judgment by Defendant Daniel W. Hendriks. Doc 77.

The instant case is **TERMINATED** from the dockets of the United States District Court for the Southern District of Ohio, Western Division at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, December 21, 2021.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE